**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**

**GREENVILLE DIVISION**

| | |
|---|---|
| **MICHAEL KYLES,**<br>**GERRY GAMBLE,**<br>**JEROME PARSON,**<br>**TYRONE PARSON and,**<br>**WALTER WILLIAMS,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**HARRIS RUSSELL FARMS, INC. and**<br>**MARIETTA C. RUSSELL,**<br><br>**Defendants.** | **Civil Action No.** 4:22cv66-DMB-JMV<br><br>**CIVIL ACTION COMPLAINT AND JURY DEMAND** |

## COMPLAINT

### PRELIMINARY STATEMENT

1. Plaintiffs in this case are five Black American farmworkers who were systematically underpaid and denied job opportunities in favor of white foreign workers by their employers, Harris Russell Farms, Inc. (HRF) and Marietta C. Russell in 2019, 2020, and 2021. While employing Plaintiffs in its catfish farming operations, HRF applied to the U.S. government to bring South African workers in under a foreign agricultural worker visa program to supplement its labor force, claiming it could not find eligible U.S. workers to take the jobs. Then, despite promises to the U.S. government that it would treat its foreign and domestic workforce equally – a requirement of the foreign worker visa program – HRF paid its white South African workers significantly more for the same or similar work. HRF's failure to pay its

U.S. workers the same rate and offer them the same job opportunities as its white South African workers is a violation of federal law and a breach of contract that has resulted in substantial wage underpayments and lost job opportunities to Plaintiffs.

2. Plaintiffs bring this action to recover damages for the job opportunities denied them by Defendants, as well as additional wages due them under federal law. Plaintiffs also seek punitive damages. They request declaratory relief on all claims to ensure that Defendants comply in the future with federal laws and regulations that prohibit discrimination and guarantee U.S. workers a hiring preference for available jobs in this country and to ensure that the importation of foreign workers will not depress the wages of domestic farmworkers in the area.

## JURISDICTION AND VENUE

3. This Court has jurisdiction pursuant to 29 U.S.C. § 1854 (the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA")); 28 U.S.C. § 1343(a)(4) (civil rights), 42 U.S.C. §§ 1981 and 1988 (equal rights under the law); and by 28 U.S.C. § 1331 (federal question).

4. This Court has supplemental jurisdiction over the claims arising under state and common law because these claims are so related to the federal claims that they form part of the same case or controversy.

5. Declaratory relief is authorized pursuant to 28 U.S.C. §§ 2201 and 2202.

6. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because Defendants are residents of this district, and the cause of action arose in this district.

## PARTIES

7. Plaintiffs Michael Kyles, Gerry Gamble, Jerome Parson, Tyrone Parson and Walter Williams are United States citizens. Plaintiffs reside in or near Sunflower County, Mississippi. At all times relevant to this action, Plaintiffs were employed performing field labor of a seasonal or temporary nature relating to the cultivation and harvesting of catfish, an agricultural commodity produced for sale in interstate commerce.

8. Defendant Harris Russell Farms, Inc. ("HRF") is a closely-held Mississippi corporation based in Sunflower County, Mississippi. At all times relevant to this action, HRF operated a farm in Sunflower County on which catfish were grown for sale in interstate commerce. At all times relevant to this action, HRF employed migrant and seasonal agricultural workers to perform agricultural labor on the farm's operations.

9. At all times relevant to this action, HRF was an employer of Plaintiffs within the meaning of the H-2A regulations, 20 C.F.R. § 655.103(b), because it had a place of business in Sunflower County, Mississippi, a means to be contacted for employment, had the ability to control the work of H-2A workers and Plaintiffs, and had a valid Federal Employer Identification Number.

10. Defendant Marietta C. Russell ("Russell") is a resident of Sunflower County, Mississippi. At all times relevant to this action, Russell managed and controlled the activities of HRF on a day-to-day basis. At all times relevant to this action, Russell operated a farm in Sunflower County on which catfish were grown for sale in interstate commerce. At all times relevant to this action, Russell employed migrant and seasonal agricultural workers to perform agricultural labor on the farm's operations.

11. At all times relevant to this action, Russell was an employer of Plaintiffs within the meaning of the H-2A regulations, 20 C.F.R. § 655.103(b), because she had a place of

business in Sunflower County, Mississippi, a means to be contacted for employment, had the ability to control the work of H-2A workers and Plaintiffs, and had a valid Federal Employer Identification Number.

## STATUTORY AND REGULATORY FRAMEWORK

12. Under the Fair Labor Standards Act ("FLSA"), "agriculture" includes farming in all its branches. 29 U.S.C. § 203(f). The definition includes catfish production and other fish farming. 29 C.F.R. §§ 780.109 and 780.120.

13. An employer in the United States may import foreign workers to perform agricultural labor of a temporary nature only if the U.S. Department of Labor ("DOL") certifies that there are insufficient available workers within the U.S. to perform the job and the employment of foreign workers will not adversely affect the wages and working conditions of similarly-situated U.S. workers. 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a), 1188 (a)(1). Foreign workers admitted in this fashion are commonly referred to as "H-2A workers."

14. Agricultural employers seeking the admission of H-2A workers must first file a temporary labor certification application with DOL. 20 C.F.R. § 655.130. This application must include a job offer, commonly referred to as a "clearance order" or "job order," complying with applicable regulations. The clearance order is used in the recruitment of both U.S. and H-2A workers and must offer to U.S. workers no less than the same benefits, wages and working conditions the employer offers or provides to H-2A workers. 20 C.F.R. § 655.122(a). Federal regulations establish the minimum benefits, wages, and working conditions that must be offered by the petitioning employer in order to ensure that U.S. workers are afforded a preference in hiring for the positions and that if foreign workers are admitted, they are employed at terms that do not adversely affect similarly-situated U.S. workers. 20 C.F. R. § 655.0(a)(1). To avoid an

adverse effect on similarly-employed U.S. workers, the regulations mandate that the wages and job benefits provided to the employer's H-2A workers must also extend to similarly-employed U.S. workers. 20 C.F.R. § 655.0(a)(3).

15. Among the specific terms required by the H-2A regulations are the following:

a. The employer will contact its former U.S. workers employed during the previous year and solicit their return to the job. 20 C.F.R. § 655.153;

b. The employer will employ at least the same kind and degree of effort to recruit U.S. workers to fill the positions as it does to obtain foreign workers. 20 C.F.R. § 655.154(b);

c. The employer will pay all workers performing the activities described in the petition or otherwise performed by the H-2A workers at least the applicable adverse effect wage rate ("AEWR") for every hour or portion thereof worked during a pay period. 20 C.F.R. § 655.122(l);

d. The employer will offer to U.S. workers no less than the same benefits, wages, and working conditions that are being provided to the H-2A workers. 20 C.F.R. § 655.122(a);

e. The employer will keep accurate records showing for each workday the number of hours offered and the starting and finishing time. 20 C.F.R § 655.122(j)(1);

f. The employer will provide to each worker on or before payday a written statement listing, *inter alia*, the hours of employment offered and the employer's name and Federal Employer Identification Number, 20 C.F.R. § 655.122(k); and

g. The employer will provide to an H-2A worker no later than the time at which the worker applies for the visa, or to a worker in corresponding employment no later than on the day work commences, a copy of the work contract between the employer and the worker in a language understood by the worker as necessary or reasonable, 20 C.F.R. § 655.122(q).

16. The clearance order must include an attestation from the employer that it describes the actual terms and conditions of the proffered employment and contains all material terms and conditions of the job. 20 C.F.R. § 653.501(c)(3)(viii).

17. The H-2A regulations also mandate that prior to filing an application for temporary labor certification with the DOL, an employer desiring to participate in the program must engage in specific steps to positively recruit domestic workers. 20 C.F.R. § 655.135(c). In recruiting U.S. workers, the employer is obligated to make the same kind and degree of effort as it does to obtain foreign workers. 20 C.F.R. § 655.154(b).

18. Positive recruitment steps include, among others, submitting a job order to the local state workforce agency (SWA) and contacting former workers through mail or other effective means. 20 C.F.R. §655.153. Before its temporary labor certification can be approved, the employer must file a written recruitment report with the DOL certifying officer listing all recruitment sources, identifying all U.S. workers referred and the results of the referral and confirming that all former U.S. worker employees have been contacted and by which means. 20 C.F.R. § 655.156(a).

19. The DOL determines whether an employer's H-2A temporary labor certification application should be approved based on various criteria, including the employer's compliance with the positive recruitment requirements set out in 20 C.F.R. § 655.153. 20 C.F.R. § 655.161.

20. Once an employer receives certification from the DOL and imports H-2A workers, the clearance order and certified H-2A application become the job contract for both the foreign workers and any U.S. workers in corresponding employment, defined as domestic workers engaged in any work described in the clearance order or any agricultural work performed by the H-2A workers. 20 C.F.R. § 655.122(q); 20 C.F.R. § 103(b).

## STATEMENT OF FACTS

21. HRF is a closely-held corporation that operates a catfish farm in and near Sunflower County, Mississippi. For a number of years, including during 2019, 2020, and 2021, its day-to-day activities have been directed and controlled by Defendant Russell. Among other things, Russell possessed and exercised the power to hire and fire employees on behalf of HRF. She set the terms and conditions of employment for the employees of HRF, including the wage rates to be paid. Russell possessed the power to assign daily tasks to employees of HRF, she supervised their work and paid them their wages.

22. Plaintiffs are among the local residents HRF has employed to perform a wide range of tasks in support of the farm's catfish production. Working in HRF's ponds and hatchery, Plaintiffs were employed handling, sorting, feeding, harvesting and transporting catfish. Plaintiffs also conducted tests to ensure that proper oxygen levels were maintained in HRF's catfish ponds and aerated the ponds as necessary. Plaintiffs operated, maintained and repaired HRF's tractors and other agricultural machinery.

23. From 2016 through June 2020, HRF employed Plaintiffs Kyles and Williams to perform seasonal or temporary work in support of its catfish farm. HRF employed Kyles and Williams primarily to perform field work, including operating equipment that controlled the oxygen levels in the ponds, operating tractors and other farm equipment and handling, harvesting

and transporting the catfish. During this same time period and into 2021, HRF employed Plaintiffs Jerome Parson, Tyrone Parson and Gamble on a seasonal and occasional basis to perform various tasks, including sorting, feeding, harvesting and transporting HRF's catfish and operating tractors and other farm equipment.

24. Plaintiffs' job duties varied depending on the time of year and included a slack period during the winter months when no feeding or aerating of the ponds takes place.

25. HRF compensated Plaintiffs Kyles and Williams $10.00 per hour for their work in 2019 and 2020. During this same period, and through 2021, HRF compensated Plaintiffs Jerome Parson, Tyrone Parson and Gamble at rates ranging from $8.50 to $9.50 per hour.

26. Prior to 2019, HRF paid Plaintiffs for their work with checks drawn on the account of HRF. In the early months of 2019, HRF continued to pay Plaintiffs from the HRF account. Starting around the time that HRF began employing H-2A workers, in May 2019, however, HRF began paying Plaintiffs with checks drawn on the account of Harris Russell Realty, LLC., a corporation owned and controlled by Defendant Russell.

27. Similarly, in 2020, HRF paid Plaintiffs during the early months of the year from its own account, and then switched to paying Plaintiffs with checks drawn on the account of Harris Russell Realty, LLC once the 2020 H-2A workers arrived for work in March 2020.

28. Despite never having provided labor or services for, or otherwise having been employed by, Harris Russell Realty, LLC, Plaintiffs were issued W-2 tax forms identifying their employer as Harris Russell Realty, LLC in addition to W-2 tax forms naming HRF in both 2019 and 2020.

29. From around 2017 through June 2020, Plaintiff Kyles resided in housing owned or controlled by HRF. HRF charged Kyles $60 per week for these accommodations, a sum that HRF withheld from Kyles' workweek wages.

30. Beginning in 2019, HRF has supplemented its local workforce by hiring foreign H-2A workers from South Africa. To obtain authorization for the admission of these foreign workers, HRF has annually sought and obtained DOL certification as described in Paragraphs 12 through 20. Without exception, the H-2A workers hired by HRF have been white citizens of the Republic of South Africa.

31. In or about March 2019, HRF submitted a temporary labor certification application to the Office of Foreign Labor Certification of the DOL's Employment and Training Administration seeking admission of two workers to be employed on HRF's operations from May 20 through December 15, 2019. This temporary labor certification application was signed on behalf of HRF by Defendant Russell.

32. In or about January 2020, HRF submitted a temporary labor certification application to the Office of Foreign Labor Certification of the DOL's Employment and Training Administration seeking admission of two workers to be employed on HRF's operations from March 1 through November 1, 2020. This temporary labor certification application was signed on behalf of HRF by Defendant Russell.

33. In or about January 2021, HRF submitted a temporary labor certification application to the Office of Foreign Labor Certification of the DOL's Employment and Training Administration seeking admission of two workers to be employed on HRF's operations from March 1 through November 1, 2021. This temporary labor certification application was signed on behalf of HRF by Defendant Russell.

34. In 2019, 2020 and 2021, HRF hired COC Placement Service, LLC as its representative and agent to assist the farm in recruiting, soliciting, hiring and furnishing seasonal labor. As HRF's H-2A agent, COC Placement Service's responsibilities included preparing HRF's applications for temporary labor certification for the 2019, 2020 and 2021 seasons, including the clearance orders submitted with the H-2A applications. The clearance orders prepared by COC Placement Service were used by HRF to recruit and solicit U.S. workers for the positions as part of the farm's positive recruitment requirements pursuant to 20 C.F.R. §§ 655.150 through 655.158. In 2019, COC Placement Service also prepared the newspaper advertisements that HRF was required to place pursuant to 20 C.F.R. §§ 655.151 and 655.152 in order to recruit and solicit U.S. workers.

35. With respect to the 2019, 2020 and 2021 agricultural seasons, Defendants did not make the same kind and degree of effort to recruit U.S. workers, including Plaintiffs Jerome Parson, Tyrone Parson and Gamble, as they did to obtain foreign workers.

36. In its 2019, 2020, and 2021 H-2A applications seeking to hire foreign workers, HRF described the job duties as working on fish ponds and in a fish hatchery. The applications described the specific job duties as handling, sorting, feeding, harvesting, transporting live fish and performing standard tests to measure oxygen levels. The job duties described also included operation of tractors and maintenance work on agricultural equipment.

37. In its 2019, 2020, and 2021 H-2A applications seeking to hire foreign workers, HRF stated that it had attempted contact with all former U.S. employees and that these efforts were ongoing.

38. In its 2019, 2020 and 2021 H-2A applications, HRF included a declaration, signed under penalty of perjury on behalf of HRF by Defendant Russell, that in its employment of H-2A workers, HRF would comply with several conditions, including the following:

a. The job opportunity was open to any qualified U.S. worker without regard to race, color, national origin, age, sex, religion or handicap;

b. That HRF had conducted and would continue to conduct the required recruitment procedures (including those in 20 C.F.R. § 655.153);

c. That U.S. workers would be offered wages, benefits and job conditions no less than HRF was offering the H-2A workers;

d. That HRF would pay at least the AEWR; and

e. That HRF's job opportunity would comply with the requirements of 20 C.F.R. § 655, Part B, including the provisions regarding recordkeeping, 20 C.F.R. § 655.122(j), wage statements, 20 C.F.R. § 655.122(k), and worker employment contracts, 20 C.F.R § 655.122(q).

39. Upon receipt and following review of HRF's 2019, 2020, and 2021 H-2A applications, DOL's Office of Foreign Labor Certification issued notices of acceptance ("Notices of Acceptance"). Among other things, these Notices of Acceptance listed the positive recruitment steps HRF would need to complete before the date that any foreign workers departed for HRF's place of employment. These steps included a requirement pursuant to 20 C.F.R. § 655.153 that HRF "establish contact, by mail or other effective means, with former employees who were employed by [HRF] in the occupation at the place of employment during the previous year and solicit their return to the job this year." The Notices of Acceptance also informed HRF

of the need to submit to DOL a written recruitment report that included confirmation that former U.S. employees had been contacted, and the means used to contact them.

40. With respect to its 2019, 2020, and 2021 H-2A applications seeking to hire foreign workers, HRF submitted to the DOL written recruitment reports, as required by 20 C.F.R. § 655.156 and reiterated in the DOL's Notices of Acceptance. These reports were signed on behalf of HRF by Defendant Russell. Each of these reports stated that HRF had contacted available former U.S. employees by phone or mail and that none of these employees was available.

41. In 2019, 2020, and 2021, Defendants failed to make the same kind and degree of effort to recruit U.S. workers, including Plaintiffs Gamble, Jerome Parson and Tyrone Parson, as they did to obtain foreign workers. Despite the fact that they were seasonal employees of HRF who had worked for the farm during the prior year, been assigned and performed each of the tasks described in HRF's H-2A applications and possessed all of the specified job qualifications, Plaintiffs Jerome Parson, Tyrone Parson and Gamble were never offered the job positions being posted for the H-2A workers, which guaranteed a minimum hourly wage at the AEWR, a minimum number of hours for the season and other benefits. Instead, HRF hired Plaintiffs to do the same work as the H-2A workers but paid them less, offered them fewer hours and failed to provide them with a copy of their employment contract or abide by the contract's guarantees.

42. Based on the information contained in its H-2A applications, the declarations and the recruitment reports, HRF was granted temporary labor certifications by DOL for the 2019, 2020 and 2021 seasons. Through their agent, COC Placement Service, Defendants then intentionally recruited only white foreign workers to fill the DOL-approved positions during each of those agricultural seasons.

43. During 2019, 2020, and 2021 Defendants compensated their white foreign workers at the Mississippi AEWR. These rates were $11.33 per hour in 2019, $11.83 per hour in 2020, and $11.88 per hour in 2021.

44. During the time they were employed by HRF during 2019 2020, and 2021, Plaintiffs were assigned and performed tasks that were either among those described in HRF's H-2A applications for those years or were performed by the H-2A workers. Nonetheless, Defendants failed to compensate Plaintiffs at the same rate as they paid their H-2A workers for performing the same tasks. Instead, Defendants paid Plaintiffs at rates substantially below the applicable AEWRs.

45. Defendants intentionally paid its Black workforce less than its white foreign workers for the same or similar work. Defendants sought to conceal this fact from regulatory authorities by paying Plaintiffs through Harris Russell Realty, LLC, although all of Plaintiffs' work was for HRF and was encompassed in the job descriptions set out in HRF's clearance orders. The white foreign workers were also given other benefits not provided to Plaintiffs.

46. Defendants failed to offer Plaintiffs work for at least the same number of hours it offered to its H-2A workers. HRF's clearance orders stated that workers would be offered at least 54 hours of work per week. HRF's H-2A workers routinely were employed 54 hours or more per week. By contrast, HRF offered Plaintiffs 40 or fewer hours of work during many workweeks.

47. Defendants did not compensate Plaintiffs for all hours worked in 2019, 2020 and 2021. On occasion, Defendants deleted or revised timeclock entries to reduce the total number of hours worked. Plaintiffs Williams and Kyles were occasionally directed to perform tasks during periods they were not "clocked in" to Defendants' timekeeping system.

48. Defendants failed to keep records with respect to Plaintiffs' labor showing for each workday the hours of work performed, the hours of work offered, and the starting and finishing times.

49. Other than the stubs for their paychecks, Plaintiffs received no other written statements relating to their earnings. The wage paystubs did not show the hours offered or Defendants' Federal Employer Identification Number.

50. From around 2017 through June 2020, Plaintiff Kyles resided in housing owned or controlled by Defendants. The housing was in poor condition, was structurally unsound and had faulty electrical wiring. For this housing, Defendants withheld $60 per week from Kyles' wages.

51. Defendants provided separate housing to their white H-2A workers free of charge that was in far better condition than the housing provided to Plaintiff Kyles.

52. The housing occupied by Plaintiff Kyles has never been certified by a State or local health authority or other appropriate agency as meeting applicable safety and health standards related to migrant housing facilities.

53. At no time did Defendants post in a conspicuous place at Plaintiff Kyles' housing a copy of a certificate of occupancy from a State, local or federal agency which had conducted a housing safety and health inspection of the facilities.

54. At no time did Defendants post in a conspicuous place at Plaintiff Kyles' housing a written statement of the terms and conditions of occupancy.

55. In June 2020, the wiring in Plaintiff Kyles' housing failed, causing damage to the trailer and ruining a number of appliances that Kyles had personally purchased. Defendants did

not repair the trailer, which had been rendered uninhabitable, or compensate Kyles for his appliances.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
MIGRANT AND SEASONAL AGRICULTURAL WORKER PROTECTION ACT (AWPA)

56. This count sets forth a claim by Plaintiffs for damages and declaratory relief with respect to the Defendants' violations of the AWPA and its attendant regulations during the 2019, 2020, and 2021 agricultural seasons.

57. At all times relevant to this action, Plaintiff Kyles was a migrant agricultural worker within the meaning of the AWPA, 29 U.S.C. § 1802(8)(A).

58. At all times relevant to this action, Plaintiffs Gamble, Jerome Parson, Tyrone Parson and Williams were seasonal agricultural workers within the meaning of the AWPA, 29 U.S.C.§ 1802(10)(A).

59. At all times relevant to this action, Plaintiffs were engaged in corresponding employment with Defendants' H-2A workers within the meaning of the H-2A regulations, 20 C.F.R. § 655.103(b).

60. At all times relevant to this action, Defendants were agricultural employers within the meaning of the AWPA, 29 U.S.C. § 1802(2), in that they operated a farm and employed migrant or seasonal agricultural workers, including Plaintiffs.

61. Pursuant to 20 C.F.R. § 655.122(q), HRF's H-2A applications and clearance orders were binding work contracts between Plaintiffs and Defendants during the periods encompassed in HRF's 2019, 2020, and 2021 H-2A applications.

62. Plaintiffs' work contracts, as embodied in HRF's H-2A applications and clearance orders, constituted working arrangements under the AWPA, 29 U.S.C. §§ 1822(c) and 1832(c).

63. In violation of the AWPA, 29 U.S.C. §§ 1822(c) and 1832(c), Defendants violated without justification the terms of its working arrangements with Plaintiffs, as embodied in HRF's H-2A applications and clearance orders. Among other things:

a. Defendants failed to pay Plaintiffs wages at least equal to the AEWR;

b. Defendants failed to offer Plaintiffs the same job opportunities that they provided to their H-2A workers.

c. Defendants failed to offer housing benefits to Plaintiff Kyles at least equal to those they provided to their H-2A workers. Defendants provided rent-free housing to their H-2A workers that was certified as meeting federal standards while furnishing Plaintiff Kyles with uncertified housing that was substandard and for which Kyles was required to pay $60 per week;

d. Defendants failed to make the same kind and degree of effort to recruit U.S. workers as it did to obtain foreign workers;

e. Defendants never notified Plaintiffs Gamble, Jerome Parson and Tyrone Parson of the availability of the positions (which offered the job at the AEWR with other benefits) for which the farm had hired H-2A workers;

f. Defendants failed to keep payroll records showing the hours worked, the daily starting and stopping times of work and the daily hours offered; and

g. The wage statements provided to Plaintiffs lacked data regarding the hours offered and the employer's Federal Employer Identification Number.

64. In violation of the AWPA, 29 U.S.C. §§ 1822(a) and 1832(a), Defendants failed to pay Plaintiffs their wages when due.

65. In violation of the AWPA, 29 U.S.C. § 1823(b)(1), Defendants permitted Plaintiff Kyles to occupy the housing facility without first having the facility certified by a State or local health authority or other appropriate agency as meeting applicable safety and health standards related to migrant housing facilities.

66. In violation of the AWPA, 29 U.S.C. § 1823(a), Defendants failed to ensure that the housing facilities it provided to Plaintiff Kyles complied with substantive federal safety and health standards.

67. In violation of the AWPA, 29 U.S.C. § 1821(c), Defendants failed to post in a conspicuous place at the housing facilities occupied by Plaintiff Kyles a written statement of the terms and conditions of occupancy.

68. Defendants' violations of the AWPA were the natural result of their conscious and deliberate acts. These violations occurred as part of Defendants' regular business practices. Defendants' violations of the AWPA were intentional within the meaning of the Act, 29 U.S.C. §1854.

69. As a result of Defendants' violations of the AWPA as set out in this count, Plaintiffs have suffered damages, including unpaid wages due them at the AEWR and denial of job opportunities to which they were entitled as U.S. workers.

## SECOND CLAIM FOR RELIEF
BREACH OF CONTRACT

70. This count sets forth a claim by Plaintiffs for damages and declaratory relief with respect to HRF's breach of employment contracts with Plaintiffs, as embodied in HRF's H-2A applications and clearance orders.

71. In accordance with 20 C.F.R. § 655.122(q), HRF's H-2A applications and clearance orders were the work contracts for Plaintiffs during the periods they were employed on HRF's operations in 2019, 2020, and 2021.

72. HRF breached its work contracts with Plaintiffs in several respects, including the following:

a. HRF failed to pay Plaintiffs wages at least equal to the AEWR;

b. HRF failed to offer and provide the same wages and benefits to Plaintiffs as HRF extended to its H-2A workers;

c. HRF failed to offer Plaintiffs the same job opportunities that HRF provided to its H-2A workers;

d. HRF failed to make the same kind and degree of effort to recruit U.S. workers, including Plaintiffs Gamble, Jerome Parson and Tyrone Parson, as it did to obtain foreign workers; and

e. HRF never notified Plaintiffs Gamble, Jerome Parson and Tyrone Parson of the availability of the positions (at the AEWR and with other benefits) for which the farm had hired H-2A workers.

73. Plaintiffs did perform, or at all relevant times were ready, willing, and able to perform, but for HRF's breaches, all their obligations under their agreement.

74. HRF's breach of these contract obligations has caused Plaintiffs economic damages.

**THIRD CLAIM FOR RELIEF**
VIOLATIONS OF THE CIVIL RIGHTS ACT OF 1866
42 U.S.C. § 1981

75. This count sets forth a claim by Plaintiffs for damages and declaratory relief with respect to Defendants' discrimination on the basis of race and alienage, pursuant to 42 U.S.C. § 1981, originally enacted as part of the Civil Rights Act of 1866 and later amended by the Civil Rights Act of 1991.

76. Through their agent C.O.C. Placements, Defendants intentionally sought out white workers to fill their labor force and paid them at higher rates than their Black U.S. workers, including Plaintiffs. Defendants gave preference in job assignments to its white foreign workers, and failed to offer at least equal job opportunities to the company's Black workers, including Plaintiffs. In addition to higher wages, Defendants provided better benefits to the white South African workers than to its Black workers.

77. Through the acts detailed in the Complaint, Defendants intentionally discriminated on the basis of race and/or alienage against Plaintiffs in their employment contracts by imposing discriminatory terms of employment and denying them the benefits, privileges, terms, and conditions of the contractual relationship.

78. Defendants' actions violated Plaintiffs' rights to make and enforce contracts and receive full and equal benefit of the law as guaranteed by 42 U.S.C. § 1981.

79. HRF's conduct intentionally and impermissibly favored white foreign workers over Plaintiffs in the making and enforcement of employment contracts and receiving full and equal benefit of the law in violation of 42 U.S.C. § 1981.

80. As a direct result of Defendants' actions, Plaintiffs were subjected to discriminatory terms and conditions of employment and have suffered substantial damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter an order:

a. Declaring that Defendants violated the AWPA and its attendant regulations as set out in Plaintiffs' First Claim for Relief;

b. Granting judgment in favor of Plaintiffs and against Defendants, jointly and severally, on Plaintiffs' claims under the AWPA as set forth in the First Claim for Relief, and awarding each Plaintiff his actual damages or statutory damages of $500, whichever is greater, for every violation of the AWPA set forth in that count;

c. Declaring that Defendant HRF breached Plaintiffs' employment contracts as set out in Plaintiffs' Second Claim for Relief;

d. Granting judgment in favor of Plaintiffs and against HRF on Plaintiffs' breach of contract claims as set forth in the Second Claim for Relief and awarding each of them his actual and compensatory damages;

e. Declaring that Defendants discriminated against Plaintiffs on the basis of race and alienage as set out in Plaintiffs' Third Claim for Relief;

f. Granting judgment in favor of Plaintiffs and against Defendants, jointly and severally, on Plaintiffs' discrimination claims set forth in the Third Claim for Relief and awarding Plaintiffs their actual and compensatory damages;

g. Awarding Plaintiffs punitive damages with respect to their breach of contract claims set forth in Plaintiffs' Second Claim for Relief in an amount to be determined at trial;

h. Awarding Plaintiffs punitive damages with respect to their discrimination claims set forth in Plaintiffs' Third Claim for Relief in an amount to be determined at trial;

i. Awarding Plaintiffs court costs, including discretionary costs;

j. Granting Plaintiffs an award of reasonable attorney's fees;

k. Awarding Plaintiffs pre- and post-judgment interest as allowed by law; and

l. Awarding Plaintiffs such further relief, at law or in equity, as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action of all issues so triable.

Respectfully submitted,

***s/ Robert McDuff***______________

Robert McDuff, MS Bar No. 2532
MISSISSIPPI CENTER FOR JUSTICE
767 North Congress Street
Jackson, MS 39202
Telephone: (601) 259-8484
Facsimile: (601) 352-4769
rbm@mcdufflaw.com